Rossov v Shemen (2025 NY Slip Op 50795(U))

[*1]

Rossov v Shemen

2025 NY Slip Op 50795(U)

Decided on May 21, 2025

Supreme Court, Kings County

Mallafre Melendez, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on May 21, 2025
Supreme Court, Kings County

Anatoly Rossov and POLINA ROSSOV, Plaintiffs,

against
Larry Shemen, M.D., Defendant.

Index No. 501207/2018

Plaintiffs
Brian J. Isaac, Esq. ([email protected])
Pollack Pollack Isaac & Decicco
250 Broadway, Suite 600
New York, NY 10007
212-233-8100
Defendant
Charles L. Bach, Esq. ([email protected])
Heidell Pittoni Murphy & Bach, LLP
99 Park Ave
New York, NY 10016
212-286-8585

Consuelo Mallafre Melendez, J.

Recitation, as required by CPLR §2219 [a], of the papers considered in the review:
NYSCEF #s: 91 — 92, 93 — 96, 98, 99 — 101, 102
Plaintiffs Anatoly Rossov ("the patient") and Polina Rossov bring this post-trial motion (Seq. No. 3), pursuant to CPLR 4404 and 4405, to set aside the jury verdict in favor of the defendant, on the ground that verdict was against the credible weight of the evidence. Defendant Larry Shemen, M.D. ("Dr. Shemen") opposes the motion.
Plaintiffs commenced this action in January 2018, asserting claims of medical malpractice against Dr. Shemen in connection to his treatment of the patient for voice hoarseness, dysphonia, and gastroesophageal reflux disease (GERD). Plaintiffs alleged that Dr. [*2]Shemen's departures from the standard of care led to delayed diagnosis of a cancerous vocal cord growth, depriving him of a chance for a better outcome. Plaintiffs presented their case, and Defendant presented their defense, before this Court in a jury trial from January 9 through January 15, 2025.
During Plaintiffs' direct case, Dr. Shemen and both Plaintiffs testified. Dr. Shemen was examined and cross-examined during the defense's case. Plaintiffs called Dr. John Bogdasarian, a physician specializing in otolaryngology and head and neck surgery, as an expert witness. Defendant also called an expert witness, Dr. Augustine Moscatello, who specialized in otolaryngology and head and neck surgery.
Following the trial and jury charges, the issues presented to the jury were whether the defendant, Dr. Shemen, departed from good and accepted medical standards by:
- [Question One] not recommending or performing a biopsy on the polypoid lesion found on the patient's left vocal cord,
- [Question Three] not advising the patient of the possibility that the polypoid lesion he diagnosed during his treatment could be malignant,
 - [Question Five] not advising the patient of the necessity of follow-up investigation of the polypoid lesion after the end of his treatment with defendant, and/or
 - [Question Seven] not advising the patient's referring physician as to the possibility that the polypoid lesion was malignant.
On January 16, 2025, the jury returned a verdict in favor of Defendant on each of the questions above. On Question One, Three, and Five, the jury returned a five-to-one verdict in favor of Defendant. On Question Seven, the jury returned a unanimous verdict in favor of Defendant.
"In order to establish the liability of a physician for medical malpractice, a plaintiff must prove that the physician deviated or departed from accepted community standards of practice, and that such departure was a proximate cause of the plaintiff's injuries" (Yac v County of Suffolk, 205 AD3d 764, 765 [2d Dept 2022] [internal quotation marks and citations omitted]). Because the jury found Dr. Shemen complied with the standard of care, they never reached the issue of whether any of the above departures were a proximate cause or substantial factor in depriving the patient of a better outcome, and they never reached the issue of awarding damages to the patient or his spouse.
Now, Plaintiffs move pursuant to CPLR 4404 to set aside the verdict. In compliance with CPLR 4405, this motion was made before the undersigned, who presided at the trial, within the time set forth by the Court. Under CPLR 4404 (a), the court may "set aside a verdict or any judgment entered thereon and . . . may order a new trial of a cause of action or separable issue where the verdict is contrary to the weight of the evidence."
Generally, "the discretionary power to set aside a jury verdict and order a new trial must be exercised with considerable caution, for in the absence of indications that substantial justice has not been done, a successful litigant is entitled to the benefits of a favorable jury verdict" (Pen v Wheels, Inc., 231 AD3d 848, 848 [2d Dept 2024], quoting Nicastro v Park, 113 AD2d 129, 133 [1985]). "A jury verdict may be set aside as contrary to the weight of the evidence only if the evidence so preponderated in favor of that party that the verdict could not have been reached on any fair interpretation of the evidence" (Dominge v Dannenberg, 228 AD3d 729, 730 [2d Dept 2024]; see also Lolik v Big V Supermarkets, Inc., 86 NY2d 744, 746 [1995]).
The weight of the evidence standard is "necessarily less stringent" than the criteria for setting aside the verdict as a matter of law, which results in a directed verdict rather than a new trial (Annunziata v City of New York, 175 AD3d 438, 440 [2d Dept 2019], quoting Nicastro at 132-133). A directed verdict is a "pure question of law," requiring a determination that the jury's verdict was "utterly irrational" and there was "no valid line of reasoning and permissible inferences which could possibly lead rational persons to the conclusions reached by the jury" (Killon v Parrotta, 28 NY3d 101, 107-108 [2016]; Blair v Coleman, 211 AD3d 671, 672 [2d Dept 2022]). In contrast, setting aside the verdict as contrary to the weight of the evidence "invokes the court's discretion" as to whether the verdict was a "fair reflection of the evidence" (Nicastro at 134-135). "The question of weight of the evidence is, in a sense, focused on whether it is more reasonable, on the basis of the evidence, to reach one of the possible conclusions rather than the other legally permissible conclusions" (Annunziata at 440 [internal quotation marks and citations omitted]). The result is "to order a new trial, since [the court] does not have the power to make new findings of fact in a jury case" (Osorio v New York City Health and Hosps. Corp., 211 AD3d 842, 845 [2d Dept 2022]).
"The fact that some of the testimony creates a factual issue does not deprive the court of the power to intervene in an appropriate case. If an absence of bona fide factual issues were required, a court would never be justified in setting aside a verdict as being against the weight of the evidence and ordering a new trial. The determination that a verdict is contrary to the weight of the evidence is itself a factual determination based on the reviewing court's conclusion that the original trier of fact has incorrectly assessed the evidence." (Yac at 766 [internal quotation marks and citations omitted]). "While great deference must be accorded to the jury's fact-finding function, a court's discretion to set aside the verdict is at its broadest when it appears that the unsuccessful litigant's evidentiary position was particularly strong compared to that of the victor." (Annunziata at 441 [internal quotation marks and citations omitted]).
Medical malpractice trials frequently turn on the testimony of medical experts. When "conflicting expert testimony is presented, the jury is entitled to accept one expert's opinion and reject that of another expert" (Ferreira v Wyckoff Heights Medical Center, 81 AD3d 587, 588 [2d Dept 2011]; see also Dominge, 228 AD3d 729 [jury could reasonably find, based on conflicting testimony from each side's experts, that the physician did not depart from good and accepted standards of medical practice]). "It is for the jury to make determinations as to the credibility of the witnesses" (Stancati v Gunzburg, 159 AD3d 1011, 1012 [2d Dept 2018]). However, when the evidence presented even by the victor's expert witness supports the other party's position or fails to counter the other witness's arguments, the court may find the jury's verdict was contrary to the weight of the evidence (see Yac at 765-766; Reilly v Ninia, 81 AD3d 913, 916-917 [2d Dept 2011] [hospital's own expert testified that "maybe" Pitocin should have been discontinued]).
The undisputed background in this case is that Plaintiff Anatoly Rossov treated with Dr. Shemen as an otolaryngology specialist from June 2015 to September 2015. He initially presented on June 22, 2015 with an existing diagnosis of dysphonia (voice hoarseness) and GERD. He had been seen by another otolaryngologist, Dr. Ovchinsky, in early 2015 as referred by his primary care physician, Dr. Zasypkin. Upon request by Plaintiffs to see a different otolaryngologist, Dr. Zasypkin referred the patient to Dr. Shemen.
Dr. Shemen saw the patient for four appointments on June 22, July 10, August 10, and September 21, 2015. On the initial June 22 visit, he performed a laryngoscopy, which revealed a [*3]left vocal cord polypoid formation (tissue growth) and erythema (redness or inflammation). Dr. Shemen testified that "ultimately" a biopsy is the only way to determine if a polypoid growth is malignant/cancerous, but that he "can see what looks benign and what looks malignant" on an initial assessment (Trial tr at 77). He assessed the patient as having GERD, prescribed medication and dietary advice, and referred the patient to a speech therapist for six sessions (id. at 77-80).
Plaintiffs' expert witness noted that a polyp is typically a benign, fluid-filled structure (id. at 334). Both parties' experts, as well as Dr. Shemen, agreed that there was a known possibility that the polyp/polypoid formation was cancerous, but even if that possibility was "low," it was considered the worst-case scenario in his differential diagnosis (id. at 82). Dr. Shemen testified that the fact he considered cancer was indicated "more or less, by the fact that I referred him to speech therapy." He further stated, "I wanted him to go for six weeks of speech therapy and then return . . . to reassess and see how he's progressing" (id. at 84-85). Dr. Shemen admitted in his testimony that he made no documentation of possible malignancy, nor did he tell the patient on any of his visits that it could be cancerous (id. at 81, 97). He testified that he did have a discussion with the patient about surgery to remove the vocal cord polyp if his symptoms persisted after speech therapy, but he answered "no" as to whether he ever imparted to the patient that he had a concern it was cancerous (id. at 96-97, 109).
The patient underwent a video stroboscopy on June 29, 2015 with the speech therapist, Winston Cheng, and those images and findings were sent to Dr. Shemen (id. at 93). Mr. Cheng noted the polypoid lesion in his evaluation and wrote that the patient should "follow up with Dr. Shemen to further discuss need for medical/surgical management of laryngeal findings" (id. at 341-343). On July 10, Dr. Shemen reviewed the video stroboscopy, according to his testimony (id. at 93-94). On the same visit, he performed a transnasal esophagoscopy and found no abnormalities in the patient's esophagus (id. at 88-90).
The patient stopped seeing the speech therapist Mr. Cheng after two sessions, and he reported this to Dr. Shemen during his August 10 appointment (id. at 102-103, 469). Dr. Shemen testified that he did not recall or have a "clear answer" as to why the patient discontinued speech therapy, but he performed another laryngoscopy and "wrote another prescription for him" to return to the speech therapist (id. at 102).
On the September 21 appointment, Dr. Shemen performed another laryngoscopy and was informed that the patient had not completed any further speech therapy sessions (id. at 107). Although disputed by Plaintiffs, Dr. Shemen contends that the patient became agitated and "stormed out" of the office during the September 21 appointment (id. at 116-117).
Dr. Shemen testified that he sent a summary of treatment letter to the patient after the final visit on September 21 (id. at 116-117). The letter included his diagnosis of "left vocal cord erythema and polypoid formation" with no mention of ruling out cancer, possible malignancy, or a recommendation of biopsy (id. at 118-119). Dr. Shemen testified that he was not concerned at that time that the growth was cancerous, but he had not ruled it out (id. at 121, 124). He testified that he believed there was a "very low possibility, but that is down the line, a possibility" that it was cancerous (id. at 107).
Following the final visit with Dr. Shemen and the summary of treatment letter, the patient returned to his primary care provider Dr. Zasypkin on September 24. Plaintiffs testified that they believed at that time the patient's hoarseness was caused by GERD, "that his vocal cord got damaged by the acid that comes up from his stomach, the acid reflux" and he did not see [*4]further specialists apart from his primary care physician (id. at 150, 159). In April 2016, Plaintiffs received a letter from Dr. Shemen's office advising them to pick up the patient's medical records and studies due to a lack of storage space (id. at 161-162). In August 2017, the patient was diagnosed with stage IV locally advanced squamous cell carcinoma of the larynx and underwent surgeries to remove his voice box.
The gravamen of this case is whether the applicable standard of care required Dr. Shemen to advise the patient his polypoid lesion may be malignant, to recommend or perform a biopsy to rule out cancer, and/or to advise the patient or his referring physician of the necessity of following up investigation of the polypoid lesion when his treatment with Dr. Shemen ended. Defendant admitted that he never advised the patient of the potential malignancy, but his position was that he appropriately referred the patient for six sessions of speech therapy as a prerequisite to performing a biopsy or other surgical treatment. He testified that it was his intention to perform a biopsy after completion of speech therapy if necessary, and that the patient's non-compliance in finishing those sessions rendered him unable to take that step.
On Question Three of the verdict sheet, the jury held that Dr. Shemen did not "depart from good and accepted standards of medical practice by not advising Anatoly Rossov of the possibility that the polypoid lesion he diagnosed during his treatment could represent a malignancy." Dr. Shemen admitted consistently in his testimony that he never discussed the possibility of cancer with the patient at any time (id. at 603). He stated in his testimony that a physician has no responsibility to tell a patient of all their conceivable diagnoses or problems — a broad answer to a broad question (id. at 81-82).
Defendant's own medical expert, Dr. Moscatello, testified that "generally speaking," it is good and accepted practice for a physician to tell a patient "what the concerns are, what the considerations are in terms of disease processes," and he further testified that "any relevant information, I don't think it should be withheld" (id. at 522-523). He offered one reason a doctor may withhold a possible malignancy is that this information could "introduce anxiety to that patient which may not be warranted at the time" (id. at 524). Thus, he opined that Dr. Shemen did not need to tell the patient the polypoid lesion might be malignant until the patient completed his course of speech therapy and his symptoms were reevaluated, at which time the risks and benefits of a biopsy would have been discussed (id. at 559).
However, the "expectation" described in Dr. Moscatello's hypothetical — "that the patient will stay with you until the course is completed" — did not occur in this patient's case (id). Instead, the patient only attended two speech therapy sessions and did not return to the speech therapist, a fact Dr. Shemen was aware of on his August 2015 and September 2015 appointments. The patient's voice hoarseness did not resolve, and there was no change to the polypoid formation or erythema. In fact, according to Dr. Shemen's testimony, he called the speech therapist directly to question "is there any benefit to further speech therapy or I am taking him to the operating room" (id. at 471). He asserted this conversation took place in front of the patient and that he encouraged him to complete speech therapy, but did not tell him the lesion may be cancerous. At this final appointment, Dr. Shemen testified that the patient stormed out, and he wrote a summary of treatment letter and sent it to the patient on the belief that he would not be returning (id. at 112, 117-118). The letter stated his medications prescribed, polypoid formation, and recommendation of speech therapy; it did not mention potential malignancy, biopsy, or any follow-up surgical intervention (id. at 118, 555-556).
It was in regard to this September 2015 appointment that Defendant's expert Dr. [*5]Moscatello was asked: "If this is a note that a doctor has written to his patient after the patient has stormed out of the office, wouldn't you agree, doctor, that good practice would require advising the patient as to concerns for malignancy or other condition and that some sort of follow up should be made?" (Id. at 556.)
Dr. Moscatello responded, "If he wasn't told previously, yes, I would think that it should be mentioned." (Id. at 556-557).
In the same cross-examination, Dr. Moscatello attempted to clarify that he did believe a "follow up" or continued course of treatment had been advised by Dr. Shemen "at every previous visit." However, he gave no correction or clarification of his statement that upon the final visit and the apparent discontinuation of speech therapy/treatment, Dr. Shemen should have advised the patient of the possible malignancy if he was not previously informed (id.). It is an undisputed fact that the patient was not informed at that time or any previous visit.
In sum, it was confirmed by Dr. Shemen's own testimony that he never advised the patient the polypoid lesion could be cancerous. Defendant's expert Dr. Moscatello reasoned that it was premature to "introduce anxiety" in his earlier appointments, because the completion of speech therapy may have resolved his symptoms and rendered a biopsy unnecessary, but this assumption no longer applied by the end of their relationship. Upon cross-examination, Dr. Moscatello agreed the patient should have been advised of a potential malignancy when he discontinued treatment, if he was never told previously. Dr. Moscatello conceded there was "nothing in the written record that would indicate that that occurred" (id. at 557), and Dr. Shemen himself admitted the potential malignancy was never discussed.
In light of the testimony of the Defendant physician and his own expert witness, this Court finds the evidence weighed so heavily in favor of Plaintiffs that the jury's finding on Question Three could not have been reached by any fair interpretation of the evidence (see Yac at 765-766; Cicione v Meyer, 33 AD3d 646, 648-649 [2d Dept 2006]).
As to Question One on the verdict sheet, the jury found that Dr. Shemen did not depart from the standard of care by not "recommending or performing a biopsy on the polypoid lesion found on plaintiff's left vocal cord during his treatment of Anatoly Rossov."
While the medical experts differed on the timing of a potential biopsy, both agreed that a biopsy was ultimately indicated in the patient's case. Defendant's expert stated that it is important to determine whether a growth is benign or malignant "at an appropriate time" (Trial tr at 548).
Plaintiffs' expert Dr. Bogdasarian opined that the video stroboscopy performed on June 29, 2015 showed lesions extending beyond a single polyp, consistent with "a perfect picture of vocal cord cancer" (id. at 339, 379). He opined that upon Dr. Shemen's review of those images, the standard of care required "rapid or nearly immediate biopsy of that left vocal cord mass" (id. at 346).
Defendant's expert Dr. Moscatello also opined that a biopsy should be performed, but after an initial course of conservative treatment. The opinions of Defendant's expert were based upon a premise that the patient should first complete a course of speech therapy, then undergo a biopsy, but this scenario never came to fruition. Although resistant at first, Defendant's expert clearly opined that when the patient's speech therapy treatment ceased, the standard of care required further investigation of the nodule/polyp, and that a biopsy was the only way to rule out malignancy. He stated that polyp is a "generalized description" which "doesn't tell you benign or malignant." When asked by Plaintiffs' counsel "Until it is ruled out by biopsy?" he responded, "Correct." (Id. at 558.)
In response to the patient's vocal cord polyp or polypoid formation, Defendant's expert opined "I would think that you would have to follow what I believe the standard of care being and that would be to complete the course of therapy and evaluate what the larynx looks like at the completion of that therapy" (id. at 503-504 [emphasis added]). He continued, "By completing a course of speech therapy, the patient has undergone an adequate amount of therapy to cause the lesion that is present to resolve if it's the result of voice misuse. . . If after six treatments the lesion is still there, then that is caused [sic] for doing a biopsy of the lesion." (Id. at 505). He opined that "what [Dr. Shemen] recommended was part of the process of getting to the point where you can make a diagnosis," but he conceded that nothing Dr. Shemen directed would have diagnosed a malignancy in and of itself (id. at 527).
Dr. Shemen himself repeatedly stated in his testimony that, although it was not explicitly documented in his notes, he viewed the patient's completion of speech therapy as a direct prerequisite to performing a biopsy or total removal of the polyp. He testified that if a growth did not respond to six weeks of speech therapy, his typical practice was to "go to the operating room and . . . take it off" (id. at 98, 468-469).
Again, a significant issue is what proper standard of care Dr. Shemen should have followed in the event — as happened in this case — that the patient never completed the six-week course of speech therapy. Defendant's expert testified that a biopsy was indicated by the standard of care if speech therapy failed to resolve the lesion (id. at 559). In the three months after his initial speech therapy referral, Dr. Shemen was aware the lesion remained unresolved and potentially malignant. He did not perform or schedule a biopsy during his office visits, nor did he recommend a biopsy in the follow-up letters sent in September 2015 or April 2016 when he knew the patient would not be returning. In sum, Defendant's expert conceded that the nodule required biopsy, and when he attempted to counter Plaintiffs' expert's opinion, he qualified it based on a scenario that did not occur. Consequently, even following Dr. Shemen's version of events and the standard articulated by his expert, the jury's determination on Question One was contrary to the weight of the evidence (see Reilly at 916-917.)
The testimony of Defendant's expert also ultimately weighed in Plaintiffs' favor with regard to Question Five: "Did the defendant, Dr. Larry Shemen, depart from good and accepted standards of medical practice by not advising Anatoly Rossov of the necessity of following up investigation as to the polypoid lesion on his left vocal cord after the end of his treatment?"
Plaintiffs' medical expert opined, in their direct case, that it was a departure from the standard of care for the physician not to inform the patient of the need to follow up/investigate the polypoid lesion with a biopsy. Defendant's expert offered little to counter this opinion, as he did not dispute the lesion was potentially malignant, that a biopsy was the only definitive way to rule out cancer, and that this was the very course of treatment contemplated by Dr. Shemen if the patient had completed speech therapy and his symptoms failed to resolve.
As noted above, Dr. Moscatello testified in the affirmative that when the patient definitively ceased his treatment with Dr. Shemen in September 2015, good practice required Dr. Shemen to advise him of the potential malignancy and "that some sort of follow-up should be made" (Trial tr at 556-557).
Of note, Dr. Shemen's records indicated that the patient at one point scheduled a follow-up at his office for October, but it was canceled. However, Dr. Shemen plainly testified that he was never aware this follow-up appointment was made by his administrative staff, and he never expected to see the patient again after the September 21, 2015 interaction (id. at 604-605). Thus, [*6]by his own admission, he believed the patient had ceased treatment, and he did not advise him to follow up with another otolaryngology specialist for an operation/biopsy, which he insisted had been part of his treatment plan.
On re-cross examination, when pushed further on the claims that the patient stormed out of the office on September 21, Defendant's expert Dr. Moscatello opined that under those circumstances he would assume "you probably would not see that patient back again," and the patient should have been advised to "make sure you see someone who is good and don't ignore the problem" (id. at 560). Plaintiff's counsel asked explicitly whether "good practice would then require that you let the patient know everything that had gone on in his treatment with you and what the concerns are . . . as you said, go get that taken a look at, go follow up for that polyp, correct?" Defendant's expert agreed, adding "As I've said, with someone who knew what they were doing." (id. at 560.) He admitted that no advice on the necessity of seeing another specialist to investigate the polypoid lesion was in Dr. Shemen's letter (id.).
Additionally, no information on the possible malignancy or need for follow up was included in the letter from Dr. Shemen's office to the patient in April 2016, when Plaintiffs were instructed to pick up records and images the office was holding. By that time, it is undisputed that Dr. Shemen knew the patient was "not going to come back" for further treatment (id. at 605-606).
It was admitted by Dr. Shemen that the patient was never previously told that cancer was part of his differential diagnosis or that follow-up treatment and testing was needed to rule out cancer. Despite the fact it was apparent to Dr. Shemen the patient was not going to return, Dr. Shemen did not convey this information or advice at the end of his treatment. Even the testimony of Defendant's expert supports Plaintiffs' contention that this was a departure from the standard of care, and therefore, the jury's verdict on Question Five was against the weight of the evidence (see Yac at 765-766; Cicione at 648-649).
Turning to Question Seven on the verdict sheet, the jury unanimously found that Dr. Shemen did not depart from the standard of care by not advising the patient's referring physician of "the possibility that the polypoid lesion on the plaintiff's left vocal cord was a malignancy."
Again, there is no disagreement from the testifying experts that the vocal cord lesion was potentially malignant at the time when it was observed/diagnosed by Dr. Shemen in June 2015. A letter dated June 22, 2015 from Dr. Shemen to Dr. Zasypkin, which was presented to the jury as evidence, stated that the laryngoscopy "showed erythema of the left anterior vocal cord with polypoid formation." The rest of the letter read in its entirety: "It is my assessment that he has GERD. He will be treated with Dexilant and diet restriction. I have sent [him] for a voice evaluation at Lenox Hill Hospital." There is no further communication from Dr. Shemen to Dr. Zasypkin, the patient's primary care physician, in the record. No plan of treatment involving possible malignancy or a biopsy following speech therapy was discussed with the referring physician.
Plaintiffs' expert, Dr. Bogdasarian, opined the standard of care required Dr. Shemen to advise the patient or his referring physician Dr. Zasypkin of the possible malignancy so that appropriate follow-up could be undertaken (id. at 380-382). Defendant's expert, Dr. Moscatello, never gave a definitive conflicting opinion on this issue, and in fact supported this argument in his own testimony. In cross-examination, he answered "correct" to the question that it is good practice "to keep the referring physician in the loop" (id. at 529).
Defendant's expert agreed that Dr. Zasypkin's prior records already reflected the patient [*7]"had a polyp related to GERD — possibly related to GERD," and this polyp was not visible in a March 2015 CT scan (id. at 537). Defendant's expert also noted that the patient's treatment included medications for GERD "with the possibility that GERD was causing the polyp and treatment of the GERD would have possibly brought a resolution to the polyp," but he added that such treatment would "obviously" be ineffective if the polyp was malignant (id.). The expert acknowledged that Dr. Shemen's June 2015 letter to Dr. Zasypkin only mentioned the existence of a "polypoid formation," without any indication of whether it was benign or malignant (id. at 530-531). He further acknowledged there was "no indication" that Dr. Shemen ever informed Dr. Zasypkin that he intended to take the patient to the operating room and rule out malignancy (id. at 531).
Dr. Moscatello's only argument for not keeping Dr. Zasypkin "in the loop" with this information was that it might be "premature" in light of Dr. Shemen's plan to reassess after speech therapy (id. at 531). However, as emphasized by Plaintiffs' counsel during cross-examination, this would only apply to the initial June 2015 letter when it was expected the patient would continue therapy and such reassessment would occur. Dr. Moscatello admitted there was nothing in Dr. Shemen's notes or records showing that he communicated with Dr. Zasypkin to tell him the patient needed to finish voice therapy or that Dr. Shemen could not "take him into the operating room until he does" (id. at 533). Dr. Moscatello did not offer any reason why Dr. Shemen would not communicate further with the referring physician, particularly in August when the patient was non-compliant with his speech therapy referral, or after the final visit in September when he returned to Dr. Zasypkin.
It is undisputed that in the only communication Dr. Shemen sent to Dr. Zasypkin, a "polypoid lesion" was documented, but there was nothing regarding possible malignancy or a plan to undergo voice therapy as a precursor to biopsy (id. at 530-531, 533). Dr. Shemen also never documented any potential malignancy in his office records. Plaintiffs' expert presented evidence through his testimony that the standard of care required Dr. Shemen to share the suspicion of malignancy for appropriate follow-up diagnosis and treatment, while Defendant's expert was equivocal and agreed in his own testimony that it is good practice to keep the referring physician updated and informed. Therefore, on this issue, the jury's verdict that Dr. Shemen did not "depart from good and accepted standards of medical practice by not advising Anatoly Rossov's referring physician" of the potential malignancy was contrary to any fair assessment of the evidence.
In opposition to Plaintiffs' motion to set aside the verdict, Defendant argues that their medical expert Dr. Moscatello was fairly assessed by the jury as more credible and knowledgeable on the standard of care than Plaintiffs' expert Dr. Bogdasarian. However, as discussed, it was the cross-examination testimony of Dr. Moscatello which further supported Plaintiffs' case that Dr. Shemen departed from the standard of care.
Defendant also raises arguments which are immaterial to the questions presented to the jury, and they do not counter Plaintiffs' showing that the verdict on those questions was against the weight of the evidence. The defense heavily emphasizes, as they did during the trial, that the patient did not undergo his recommended six sessions of speech therapy, and his credibility was challenged regarding whether he lost insurance coverage for the remaining sessions. The defense also points to Plaintiffs' equivocal testimony on whether the patient was informed he had a vocal cord polyp. Even so, it is undisputed that the patient was never told of the potential malignancy of that polyp, or that a biopsy was needed to determine if it was cancerous.
It is immaterial that the patient had undergone a CT scan in March 2015 prior to his treatment with Dr. Shemen, as all the parties' medical experts were in agreement that only a biopsy would definitively rule in or out malignancy (id. at 558), and the patient was never advised by Dr. Shemen to undergo said biopsy for the purpose of ruling out cancer.
The patient's alleged delay in seeking treatment from other specialists over the following months is also wholly immaterial to the issue of Dr. Shemen's liability. Whether the delay in diagnosis was partly attributable to the patient would relate to proximate causation or damages, not whether Dr. Shemen departed from accepted medical standards.
In reply, Plaintiffs argue that Defendant focuses on facts and testimony which are not relevant to the jury's determination on Dr. Shemen's alleged negligence. The Court agrees. Based on Dr. Shemen's own testimony and the testimony of his expert witness, there was a strong evidentiary showing that Defendant departed from good and accepted medical practice by not advising the patient or his referring physician of the potential malignancy, not advising the patient that follow-up investigation was necessary after his final visit, and not recommending a biopsy.
Therefore, this Court holds that the jury's findings on Question One, Three, Five, and Seven that Dr. Shemen did not depart from good and accepted medical practice could not have been reached upon any fair interpretation of the evidence (see Yac at 765-766). "We must conclude that the evidence preponderated in favor of the plaintiffs, and that their evidentiary position was particularly strong" compared to the defendant physician (Reilly at 917; see also Cicione at 648-649). As the jury's conclusions on these questions of fact did not fairly reflect the evidence presented, the verdict in Defendant's favor did not constitute substantial justice and must be set aside.
"The consequence of a determination that a jury verdict in a civil action is contrary to the weight of the evidence is a new trial" (Pen, 231 AD3d 848; see also Osorio at 844).
Accordingly, it is hereby:
ORDERED that Plaintiffs' motion (Seq. No. 3) is granted, and the jury verdict which was issued on January 16, 2025 is set aside in its entirety, pursuant to CPLR 4404 (a); and it is further
ORDERED that the parties are directed to appear for an in-person conference on June 4, 2025, at 11:30 a.m. in Courtroom 561.
This constitutes the decision and order of this Court.
ENTER.
Hon. Consuelo Mallafre Melendez
J.S.C.